Our first case for argument is Dukane Precast v. Perez. Mr. Waters. Good morning and may it please the Court. I am Paul Waters, representing Petitioner Dukane Precast, Inc. in this matter. This case arose out of an incident voluntarily reported by Dukane Precast, Inc. to OSHA involving entrapment of one of its employees in a sandbin in its Naperville, Illinois, Precast concrete plant. OSHA came and conducted an inspection and discovered that employees had attempted to extract that entrapped employee from the sandbin and eventually issued three serious violations and one willful violation of the Occupational Safety and Health Act. The ALJ sustained those violations and Dukane is here today petitioning for review of only Citation 1, Item 1, alleging a serious violation of 29 CFR 1910.23.C.3 and Citation 2, Item 1, alleging a willful violation of 29 CFR 1910.146.D.9. I want to start first with the issue of the willful classification itself, because to us that issue presents the most grievous error, if you will, committed below. This Court has stated previously in Leydig-Malting and in L.E. Myers that willfully means knowingly, and knowingly has been defined as actual knowledge of both the facts relating to the hazardous condition and the legal obligation flowing from those facts. What an employee or employer should have known is not enough to support a willful classification. In this case, the ALJ bases her determination of willfulness, clearly from the plain words in her opinion, on what one plant employee, manager Don McKenzie, should have known and should have done when he observed the employee trapped in the sand bin. We believe that this departs from the requirements of law because it imposes a constructive knowledge test instead of an actual knowledge test. When McKenzie showed up the second time, you know, he was there initially, and then he went somewhere and then came back, he saw Ortiz with the sand up to his waist, right? No, Your Honor. I believe the record indicates that when McKenzie saw Ortiz the first time, Okay, I thought there were three times. Okay, so it's the first time he saw him. At that point in time, Ortiz was, the sand was already down to his waist. Ortiz was relaxed. He was joking with Mr. McKenzie. This is the initial view, and Ortiz admits that he made a joke with Mr. McKenzie. The employees had made good progress, and as much as they should not have been trying to dig him out, they were digging him out and made good progress down to his waist. McKenzie received assurance. Hadn't McKenzie been told long ago by Gorman that you have to call the fire department when someone is trapped in a bin or silo? No, Your Honor. The record does not reflect that. McKenzie never received any training as to how to deal with accidents. That's correct, Your Honor. Don McKenzie testified he had not received any training. He's in charge of the facility, and he doesn't receive any training? No, Your Honor. I'm talking about permit-required confined space training and response to an emergency. Yes, that's what I'm talking about. Correct. These huge containers of sand are safety hazards. Now, are you saying he was never instructed on what you do if someone is trapped in one of these? Well, Mr. McKenzie was not aware... Is that what you're saying? He was never given any instructions? Correct, Your Honor. I will say... He was never told anything about this? Mr. McKenzie had not received instructions about that. So, in other words, you can shield yourself from any liability just by keeping your employees ignorant of the risks of the facility? No, Your Honor. There was no... Yeah, that's what you're saying. No instruction is required. I'm not saying that, Your Honor. What I'm saying is that Mr. McKenzie, through an oversight perhaps, had not received the training that he should have received, but an oversight is not a willful violation of the Act. He simply wasn't aware? He's in charge of this facility, and he's not aware that there are potential safety problems? Your Honor, the natural impulse... Yes or no? He did not consider this...  Is he unaware that there are safety hazards associated with, you know, huge containers of sand? He was unaware that a sandbin presented special kinds of considerations, yes, Your Honor, with respect to potential entrapment of people's... Special? I don't understand it. A sandbin containing sand obviously has the potential to engulf an entrant. This is why... He was aware of that? He was not aware of that, Your Honor. Oh, he didn't know you could fall into sand? He didn't know that sand could collapse and engulf employees. This is not something that's obvious to everyone, Your Honor, that sand can actually sink of its own accord based on gaps beneath it and... How long had he been in charge of the plant? Excuse me, Your Honor? How long had he been in charge? Mr. McKenzie had been put in charge of the plant, I believe, in 2007. So it had been a matter of years? This had been a matter of years, and during that entire time there had never been an incident in the sandbin, and McKenzie testified that he was not aware that Ortiz entered the sandbin to perform work. Only maintenance employees, when the sandbin was empty, would enter the sandbin to perform work. What did he do before he became manager of the plant? He performed a variety of tasks, starting out at a lower level in 2002, I believe. With the same company? With the same company, Your Honor. Again, not working in the production side in terms of working with the sandbin. His active duties at the time involved overseeing people working in the production area and William Ortiz, who worked with the sandbin, but he did not personally do that kind of work. Had Gorman never spoken to McKenzie about safety problems? Gorman's recollection was that he thought that McKenzie should have been trained in permit-required confined spaces, but the records indicate that he was not trained in permit-required confined spaces, Your Honor. Did Gorman give him any kind of instruction related to safety? Yes. Gorman provided all employees safety training, covering all of Duquesne's safety rules. Gorman? Tom Gorman, Your Honor. Did Gorman say anything to McKenzie about safety? About safety in general, yes, Your Honor. He provided instruction to McKenzie and all employees. But he never mentioned the sand? But he never mentioned the sandbin being a permit-required confined space to Don McKenzie, according to McKenzie's testimony. That's correct, Your Honor. And there had never been prior incidents involving entries into the sandbin when they were full by Duquesne employees to put McKenzie on notice. Other than the sand where he got stuck, were there other containers that did qualify in that company where I think you're trying to differentiate, say that this particular sandbin was not under a certain category. And I think, and I'm asking you, did the company have those that were in the category? Your Honor, the company had identified spaces to be permit-required confined spaces, yes. And in fact, Gorman testified he believed that he had encompassed the sandbins within the category of silos that he had identified as permit-required confined spaces. The problem is that the sandbins were a distinct piece of equipment from silos. So although Tom Gorman assumed that they encompassed the aggregate bins. So they did have silos. They did have silos. And various plants had mixers, for example, that were big enough to bodily enter and presented hazards so as to qualify as a permit-required confined space. So there were various others. The record actually, in this case, doesn't reflect, other than silos, other permit-required confined spaces in this particular plant. So that's why, that would be one reason you think McKenzie didn't think this was a silo, I guess. Correct. Permit-required confined space entries were a rare occurrence in this area. Even Ortiz indicated that he'd only entered the sandbin on a few prior occasions. So this was not something that regularly occurred at all. See, what he didn't see, I guess, he didn't see it when Ortiz was yelling for help and he's up to his neck. He did not see it at that point. And the other guys jump in. They had been trained not to, I think, but they did anyway. They jump in and they're using a bucket brigade and somehow or other they got it down to his waist when McKenzie shows up. I think that's an important point, Your Honor. Nobody responding to that emergency realized that the sandbin could be considered a permit-required confined space. And that's where all of the... It's absurd that they're not informed of that. I agree, Your Honor. And interestingly, OSHA did not cite for failure to label. Have there been other fatalities? Excuse me? No, Your Honor. There were no prior incidents. Yes, no, there has been another fatality in 2014. You're not aware of that? Oh, I thought you said before the incident, Your Honor. Fatalities. Before the incident, no. After the incident, there was a fatality at a different location, which is not on the record. These things are cone-shaped, as I understand it. Isn't that right? They come down into a funnel, sort of? Yes, Your Honor. And obviously on the top you have a wider surface. As you get down, the pressure would be much more. And I think when the guys were in there, it was hurting him. He says, you know, don't step on the sand. It compacts it more. It's hurting my back. So as I understand it, when it got down to his waist, it was much more compact and difficult to get out. Your Honor, the structures are basically parallel, parallelograms, down to a certain point and at the bottom tapered to a cone. Somewhere where the pressure gets greater as you go lower. Right, but the sand was coming in from the side, so applying pressure to Ortiz's body. You are correct, Your Honor. Well, it seemed to me what the OELJ was most concerned with was his walking away at that point. But when he saw Ortiz. When he saw up to his waist, and Ortiz had said earlier that call 911. Did anybody call 911? Ortiz seemed to know that. Ortiz did not recognize the space. The permit required confined space. He testified that he had inquired at some point if anyone had called 911, but then he also admitted that when someone said, do you want us to call 911? He said, just keep digging, get me out of here. So there is a conflict as to the urgency about 911. So someone else knew that that was an option? Yes, Your Honor. And it all depends on whether people realized it was an emergency sufficiently grievous enough to call 911 since they didn't know it was a PRC, a permit required confined space. I see him in my rebuttal time if there are no further questions. I don't understand. Why would it matter whether they knew that it was a permit required confined space if they see this person trapped there being squeezed by the sand? Why wouldn't you just automatically call 911? No big deal. Your Honor, the permit required confined space rescue, prohibition on employee rescue, if you will, is in derogation of common impulse, if I could put it that way. Employees naturally want to rescue an employee who's in trouble. Yes, of course, and while they're doing that, they call the experts. They call the fire department. They do when they... It's extraordinary negligence, and for you to be defending it, I find very disturbing. Well, Your Honor, I... Munich was fine. They never had to call 911. They just keep digging, trying to get the guy out with crushed feet or whatever happened to him. Your Honor, no one perceived the situation as an emergency. That's the situation, unfortunately. So I will yield at this time and reserve the remaining time for rebuttal. Okay, Ms. Tryon. May it please the Court, good morning. I'm Amy Tryon from the Department of Labor. I'd like to begin with the factual issue of whether Mr. McKenzie had received the confined space training. He did, as Mr. Waters stated, testify that he hadn't received such training, but the ALJ found at pages 13 and 14 of the decision, she found that testimony to be untruthful, just like she had discredited Mr. McKenzie's testimony that he didn't appreciate the gravity and the danger of the situation. She found that he had received training. Mr. Gorman, the safety director, testified that he believed he had trained Mr. McKenzie in confined spaces and that that training would have included the direction, the requirement to call 911, that being the sum total of... How long did it take 911 to respond to the call? It was a matter of minutes. Well, how many minutes? I don't know if the... I believe the phrase in the testimony was a matter of minutes. I don't know exactly the exact number of minutes. Well, where is the fire department relative to the plant? I'm afraid I don't know that either, Your Honor. But they were there quickly. It took them three and a half to four hours to get Mr. Ortiz out of the stand. I suppose if you were in this position that the victim was in, where you suck it down a matter of minutes could seem like a matter of eternity if you're disappearing quietly. So you're screaming for help. That's correct, Your Honor. And wouldn't he impulse me to go help him when he's screaming for help? It would, Your Honor, and that's exactly why the confined space standard requires prevention of such rescue attempts. The situation of an employee caught in a sand bin... Let him sink, you say. I'm sorry? Let him sink. Not at all. The confined space standard requires prevention of unauthorized entry, which is not an issue in this citation but was upheld by the ALJ, requires prevention of unauthorized entry and requires the standards designed to prevent well-meaning would-be rescuers. The concept of an employee caught in a sand bin like this is the prototypical confined space emergency that OSHA documented when it promulgated the standard in the first place. And people are well-meaning. They do go in after a colleague trying to save him or her and can, despite meaning well, make things worse. And that is the purpose of the standard. Just like people who can't swim will jump into a well, water over their head to save some friend or relative. That's right. Or even a dog. Even a dog. But that's not an employment situation where you have... I understand that. When I say the impulse of the employee is to go to help, do something to help. Absolutely. And it's the employer's responsibility to not just develop a plan for preventing that kind of situation but to implement that plan. Was the guy named Huerta sort of in charge of that group or at least the senior guy? Huerta was one step below Mr. McKenzie. Okay. So he's the... We'll put it this way. We put it in a military sense. He's the first in command of this crisis, of the emergency. McKenzie is not present at the time. I think he came running over when somebody called or something. I don't remember the details. McKenzie wasn't present at the beginning. That's correct, Your Honor. And that's when he's up to his neck. He's yelling for help. That's right. And naturally, people jump in. But at some point, I think Huerta pretty much told McKenzie it's under control. He's got it. I think that's when McKenzie showed up and he's up to his waist. But Huerta and others... This is after an hour and a half, incidentally. That's right, Your Honor. Yeah, he'd been in there a while. And they'd gotten cleared out and that's where maybe Ortiz is a little more relaxed. But at the same time, he can't move his legs and everything. And I know it hurt his back a little bit when the other guys got in there because they're compressing the stand and it's coming in on him. Well, and I think it's important to note, first of all, that several laborers using five-gallon buckets worked for more than an hour and were unable to free Ortiz. But also... Somebody should have called... Your position is somebody should have called 911 right off. That's right. And Duquesne has also, in their briefs, perpetuated the impression that once the stand was down to Mr. Ortiz's waist, somehow the danger had disappeared because he was able to make a joke. And that's not true at all and a very key aspect of this situation is that the hazard was ongoing. And it wasn't just Mr. Ortiz who was in danger. It was all of the would-be rescuers. The stand could have collapsed at any time. It was unstable stand. It had already partially collapsed. When the workers were... The reason it took them so long with the buckets and that they weren't getting anywhere is that they would move a bucket of sand and then more sand would collapse from the side. And so this hazard was an ongoing hazardous situation and Mr. McKenzie's inaction in face of that plainly dangerous situation was plain indifference to employee safety and health. So that goes up above negligence. Now we're talking about the willful issue and whether he should have known or at least I guess maybe he was trained or to not walk away. I think that seemed to be the ALJ's main concern. In addition to all the other rules and stuff in their own program. Yes, Your Honor. And I did want to address on the standard for willfulness. The cases cited by opposing counsel L.E. Myers and Latish Malting. Those are the require actual knowledge. Those are criminal cases and discuss the issue in those cases is the state of mind required for a finding of criminal willfulness. This court has had two civil OSHA cases like this one. Lakeland Enterprises and Globe Contractors. They're both in the brief holding that the standard for how you know you have willfulness for a civil OSHA violation is either intentional disregard of or plain indifference to employee safety and health. Do both of those cases have prior accident? I believe both of those cases had prior citations for similar violations, yes. But neither had a finding that the actual knowledge of the standard that was being violated. The findings rather were that the management knew of the dangerous situation and either condoned or ignored it. The D.C. Circuit and the First Circuit have a slightly more colorful description of what plain indifference means which is a state of mind such that if the employer were informed of the applicable standard he wouldn't care. But what if McKenzie simply had forgotten what Gorman had told him and he didn't know about calling the fire department and thought that the other workers would just be able to dig Ortiz out. That would be negligent and very stupid but would that be indifferent? Indifference to safety? I think it's important here Your Honor that the ALJ made a factual finding Mr. McKenzie testified that he because Ortiz was joking he didn't believe that the situation was dangerous or constituted an emergency and the ALJ found that to be untruthful and she gave reasons for her for her finding including that that testimony was inconsistent with the credible testimony of the other witnesses and importantly it was She doesn't make allowance for stupidity. Well she she believed that he was not she found as a matter of fact as a credibility finding Not that he was stupid he was lying. That's right Your Honor. How do you find that? She found she gave three reasons his testimony was inconsistent with the credible testimony of the other eyewitnesses Do you look pretty bright? Most important I think his testimony was inconsistent with the actions and the urgency of the other people who were there as Your Honor pointed out that the instinct is to do something to address the gravity of the situation Everybody else all of the other workers who testified Mr. Sarasides was one he said he went to help right away because and his first thought was to clear away the sand from Mr. Ortiz's mouth and nose so that he wouldn't suffocate and everyone else understood that this is a situation that needed help Mr. McKenzie he looked at the situation he encouraged the hazardous behavior to continue by encouraging the employees to continue to try to get Ortiz out he walked away he went to work in another part of the plant the ALJ found he was gone for 45 minutes to an hour and he never came back to see how the welfare of his employees were progressing he only called 911 in the end after an hour and a half roughly had lapsed when Mr. Huerta came to him and said Ortiz is asking this time why hasn't anybody called 911 and even then McKenzie still said well can you guys get him out or what I'm paraphrasing and at that point Huerta said I don't think we can and that's when only then did McKenzie call 911 Did Huerta come up with the bucket brigade solution initially? Who ordered that? I believe it was an employee called named Jaime Morin he was I think the first one to hear Mr. Ortiz's cry for help and to appear but I'm not entirely positive I believe Mr. Huerta was not among the first one or two or three employees Somebody had an idea you know that's how you get it out and they tried other things too they tried bringing some wood into the bin to shore up the sides they tried some kind of mechanical winch to hoist Mr. Ortiz out and that didn't work either With a rope around him Yes It's very sad and it's one of these things that fortunately he didn't die but this is only the only thing I'm just make sure it reaches that standard that it does that willful and that it's not just going to be stupid or somebody is misinformed or whatever That's all We believe what makes this conduct willful this violation willful is the actions or rather inactions of Mr. McKenzie he had that heightened awareness he was the plant manager in charge of all of these people he had the ALJ found he had received at least some confined space training and he witnessed he personally witnessed this ongoing hazardous situation this was not a game this is an industrial sand bin that contained unstable sand and these people's lives were at risk So we believe that the willful characterization is certainly not arbitrary and capricious for the ALJ to have found I could address  the other issues that Duquesne raises in its appeal Well The railings Pardon me? The railings The railings yes So the railings standard at issue here requires a 42 inch high what's called a standard railing when you have an opening when you have a raised walkway that's open to the standard covers four different types of things one dangerous equipment two galvanizing or pickling tanks three degreasing units and four other similar hazards and the ALJ found that the bin here was the first of those four things dangerous equipment Duquesne says well this isn't similar enough to a pickling or galvanizing tank because if you fell into one of those you would probably die right away or as opposed to falling in the sand bin you might not die at all like Mr. Ortiz didn't die and the secretary's position is there's nothing in the standard that requires instantaneous or guaranteed death to be characteristic of the hazard before the railing is required I also did want to note Mr. Waters correctly pointed out I made a mistake in citing the Bethlehem steel commission case and I misstated what was the standard that was an issue in that case it was a different railing standard not the one cited here but the point of my comment    standard that was required to be a 27 inch high wall that's not enough and that principle applies here too the wall came up above the platform but when you have a 42 inch platform 27 inches isn't high enough again the holding of the ALJ on that point not arbitrary and capricious did he sue the company I'm afraid I don't know because he did sustained injuries he testified herniated disc some back injury and feet and ankles something along those lines I don't know about the facts of this case     your honor I believe that the evidence does not support the facts and the legal obligations flowed from that and that's what we need for a willful violation I agree with you your honor I believe judge Easterbrook said that criminal recklessness is akin to the plain indifference and criminal recklessness is a very high standard it requires an awareness of facts sufficient to draw a  to the case your honor I believe that judge Easterbrook said that criminal recklessness is a very high standard it requires an awareness of facts sufficient to draw a